# ANTHONY P. MILLER, Inc., v. NEEDHAM et al.

## Civ. No. 92.

District Court, E. D. Pennsylvania.

Sept. 9, 1940.

Edward H. Cushman, of Philadelphia, Pa., and Thomas H. Munyan, of Atlantic City, N.J., for plaintiff.

Lewis M. Stevens and Joseph A. Byrne, Jr., both of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

This is a suit by a general contractor upon three surety bonds, given by a subcontractor, one of the defendants, with the Bonding Company, the other defendants, as surety, for damages to the plaintiff by reason of the subcontractor's delay and inefficiency in prosecuting the work, his failure to complete the work, and his failure to pay material bills in a substantial amount.

The case was tried to the Court without a jury and, at the trial, the parties stipulated the first two items of damage to be $13,000, and have agreed to liquidate the amount of unpaid claims of materialmen after the trial, in the event that the Court finds the defendant liable. The subcontractor has not been served with process, and the sole question, therefore, is whether or not the Bonding Company is liable on the bond, and, if so, the nature and extent of its obligation.

The defenses are: First, fraud on the part of the subcontractor participated in by the plaintiff, in procuring the bond; and, second, overpayments by the contractor to the subcontractor.

Miller—it is not necessary to distinguish between Anthony P. Miller and the corporation plaintiff—had a contract with the Government for the construction of what is known as Westfield Acres Housing Project in New Jersey. Three items of the work—heat, plumbing, and outside distribution—were let to Needham by a subcontract executed September 3, 1936. Needham's bond to Miller as obligee, with the Bonding Company as surety for the performance of the work, was executed September 22, 1936. The work was begun September 24, 1936. Needham abandoned his contract December 24, 1937.

The defense of fraud is based upon the fact that Needham, who was decidedly weak financially, arranged for what has been called euphemistically an "overnight loan" of $10,000 with the Mainland National Bank—a small country bank of which Miller was president—and included as an asset in his financial statement to the Bonding Company a cash deposit of $10,000 thereby obtained. As a matter of fact, simultaneous with his obtaining the loan, he gave his check to the Bank for the full amount, with the result that what appeared to be a deposit was never available to him and was not a cash asset at all. The whole transaction was a pure fraud, and was an inducing cause for the defendant's becoming surety.

However, there is not, in my judgment, sufficient evidence to connect Miller with the fraud or to establish the fact that he had knowledge of it. I am not basing this conclusion upon his denials nor upon those of Needham, nor upon the testimony of Ware, the cashier of the Bank, and I do not make the finding requested by the plaintiff that Miller did not know of or participate in the fraud. But there is no direct testimony, in evidence, that he did, and, without such testimony, the circumstances, though affording plenty of ground for suspicion, are not sufficient to constitute evidence of the fact. Needham, it is true, did make several statements, sworn and unsworn, to the effect that Miller in his presence arranged with the cashier of the Bank for the loan, but, by stipulation, the only testimony of Needham's received in evidence was a deposition made June 21, 1940. By reason of Needham's physical condition this deposition was made before the official Court Reporter without counsel being present. As to his various earlier statements, the stipulation was that they might be received in evidence, but solely for the purpose of impeaching his credibility. I reject his deposition upon all controverted facts as wholly unworthy of belief, but that does not supply the evidence necessary to establish the defendant's point. My finding, therefore, is that the defendant has failed to meet the burden of proof in respect of Miller's knowledge of and participation in Needham's fraud.

It is undisputed that Miller, from the beginning of the work, financed Needham through the medium of ninety-day acceptances. These trade acceptances were given by Miller from time to time, ostensibly on the basis of materials actually contracted for, in order to allow Needham to obtain trade discounts as well as to meet payrolls. It is also undisputed that as a result of advances obtained in this manner, Needham, when he quit the job on December 24, 1937, had received approximately $46,000 more than the 85% of the value of the completed work to which he was entitled under the first clause of Article XIII of his contract with Miller, and that the contractor's retained percentage was invaded to that extent. There is a dispute as to when the overpayments began, the plaintiff contending that in the case of each trade acceptance the payment to Needham was made when Miller paid the acceptance at the Bank 90 days after it was given. This is not a correct view of the transaction. The transaction in effect consisted in Miller borrowing the money from the Bank, advancing it to Needham, and repaying the Bank in 90 days. I therefore find that the overpayments began almost immediate-

ly after the work was started and continued until Needham left the job.

■ A more substantial dispute had to do with a later clause of Article XIII, which provided that the contractor might, in order to expedite the work, make payments (in addition to the regular 85% on estimates) to the subcontractor for materials prepared and ready for delivery, upon production of fire insurance policies and evidence that the materials were stored for the subcontractor. Even if this clause be stretched to support all payments made by the contractor for all labor and materials that actually went into the job, it remains undisputed that a large part of the money received by Needham on the trade acceptances was diverted from the job to other purposes. Needham puts this amount at about $17,000. The plaintiff argues that it is about $7,700. However, I accept the testimony of the defendant's accountant upon this point and find that the amount of money which Needham received from Miller which did not go into the Westfield Project amounted to $33,788.21.

The law of New Jersey governs, and it is stated as follows in Meyer v. Standard Accident Insurance Co., 1935, 114 N.J.L. 483, 490, 177 A. 255, 259: "It is a general principle that any material alteration in a building contract will release nonconsenting sureties upon a bond given to guarantee the faithful performance of the contract, and to protect the owner against any claims or liens for labor or materials used in the construction of the building. Whether a payment made by the owner before it has become due, or in an amount larger than provided for in the contract, is such a material alteration of the contract as to release the sureties, is a question upon which the decisions do not agree; but the great weight of authority seems to be that such payments will release the sureties, the argument being not only that the sureties are entitled to have the amounts reserved in the contract applied to the satisfaction of possible liens or claims against the building, but also that the fact that there are earned, but unpaid, moneys in the hands of the owner, will act as an incentive to the contractor to execute his contract in a faithful manner."

The plaintiff urges that Judge Arant in a very interesting article in the University of Pennsylvania Law Review for April, 1932, vol. 80, p. 842,[1] has demonstrated that the view that overpayments by a contractor constitutes material alterations of the contract is fallacious. To this I can only answer that I am bound by the law of the State of New Jersey, under which it seems to be clear that if overpayments in a material amount are made the surety will be released. Detriment to the surety will be presumed from any substantial impairment of the retained percentage, which the New Jersey Courts regard as a security by way of money in hand to pay liens and an incentive to the contractor to complete. See Note.

The important issue of fact in connection with the defense of overpayment arises upon the question whether or not the defendant, before it executed the bond, had knowledge that Miller proposed to finance Needham by means of trade acceptances, an arrangement which, if known, would, it seems to me, give notice of an intention to make payments from time to time beyond the required retained percentage.

■ The defendant itself had no such knowledge. I reject the testimony of Hager, the defendant's agent, to the ef-

---

[1] Note: I am not even sure that Judge Arant's criticism of the "material alteration" theory of sureties' release would apply to this case. It is directed principally to cases of premature payments, where the only "alteration" consists in the obligee making, and the contractor receiving, part performance earlier than provided for in the contract. He points out that "since the obligee can refuse to make further advance payments, the relation of the parties resulting from the original agreement are not altered as to the future by a premature payment." In the present case, if the plaintiff's witnesses are to be believed, the arrangement for financing the contract by trade acceptances (which meant anticipating payments in contravention of the express terms of the contract) was made before the contract was entered into, and was confirmed almost immediately afterward and before any such advances were actually made. This being so, not only was the contract itself altered in a material point, but it might even be said that the surety guaranteed performance of a contract not actually entered into at all, and is now being charged with responsibility for one quite different from that which it guaranteed.

fect that he advised Ehnes, an officer of the defendant company, by telephone that such course was contemplated. Hager unquestionably knew all about it himself. Hager was the defendant's general agent. He was also Miller's insurance advisor. The legal question involved is whether his knowledge is to be imputed to the defendant and his waiver of the requirement for retained percentages binding upon the defendant. The answer depends upon the scope of Hager's authority.

His contract of agency with the defendant contained an express provision denying him any power to "alter or agree to any alteration, extension or waiver of any * * * contract * * * unless specifically authorized in writing by the company so to do." In the face of this specific limitation of authority, the fact that Hager considered himself a "general agent," even in connection with a letter of the defendant to a third party stating that "All of the business of this company in the eastern half of Pennsylvania is under the jurisdiction of our Philadelphia agent," and a letterhead used by Hager himself upon which he was described as general agent, and a paragraph in an insurance directory in which he was described as a general agent for several surety companies including the defendant, is not sufficient to make his acts in respect to waivers or alterations binding upon the defendant. Even if this all amounted to a holding out by the defendant of Hager as its "general agent"—which it does not—the term general agent has no such well defined meaning that one can predicate the precise scope of the powers of any particular general agent upon the mere fact that he is permitted to use that appellation. The plaintiff, to support his contention in this respect, called two witnesses whom I permitted, over objection, to testify as to the general understanding of the term in the insurance business. Both, however, agree that "general agent" is a term of variable meaning, usually applicable to insurance agents who have somewhat more authority than mere brokers and who get a larger commission in consideration of maintaining an organized office and employing and paying their own subagents and brokers. Both agree that there is nothing about employment as a general agent which would override a specific limitation in the agent's appointment or give him broader powers than granted thereby.

I therefore conclude that the defendant did not waive the provision of the contract for retention of a percentage of the payments and that it did not consent to an alteration of the contract in that respect.

The complaint may be dismissed.